FILED
2026 Jan-26 PM 06:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:23-cr-0021-CLM-SGC** |
| | ) | |
| **MARCUS SPANEVELO** | ) | |

# GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

The United States of America, by and through undersigned counsel, responds to Defendant, Marcus Spanevelo's, Motion to Strike the Government's Notice of Intent to Seek the Death Penalty. Dkt. 99.

For the reasons set forth below, Defendant's motion should be denied.

## I. INTRODUCTION

Defendant seeks to dismiss the government's notice of intent to seek the death penalty ("NOI"), timely filed on October 5, 2025. Dkt. 79. Much of Defendant's motion misconstrues the Federal Death Penalty Act of 1994 ("FDPA"), codified at 18 U.S.C. §§ 3591-3598. It specifically invites this Court to rule in contravention of § 3593(a). The statute requires the filing of an NOI at "a reasonable time" before trial whenever the government intends to pursue capital punishment. It does not require formal notice of an intention to forgo capital punishment. Thus, to the extent

the statute requires "good cause" for the amendment of an NOI, it does not require justification to revisit communication of a decision not to seek the death penalty.

In this case, the government informed the court on February 27, 2023 (34 days after the filing of the indictment), that it would not seek the death penalty. Dkts. 1, 12. The decision occurred before President Trump's election and, by extension, before he issued Executive Order 14164, reprioritizing the death penalty. Ex. A. Following the executive order, the Attorney General directed the AG's Capital Review Committee ("CRC") to review no-seek decisions in all pending capital-eligible cases. Ex. B. The mandates from the President and Attorney General reflected their broad authority in law enforcement: "[t]he Executive Branch has exclusive authority and absolute discretion to decide" whether to prosecute a case, *Trump v. United States*, 603 U.S. 593, 597 (2024) (citing *United States v. Nixon*, 418 U.S. 683, 693 (1974)), and ordinarily "should remain free before trial" to bring additional charges. *United States v. Goodwin*, 457 U.S. 368, 382 (1982).

Though Defendant asserts the government delayed for 951 days before filing an NOI (Dkt. 99 at 1), he bears responsibility for *at least* 733 days of that time, having filed multiple motions to continue the trial for his own benefit. The government's reevaluation of its initial decision does not, as Defendant says, create a "new regime" or empower it "to keep defendants and district courts guessing" about the death penalty. Dkt. 99 at 4-5. The government relied on its internal

"Protocol" (Justice Manual ("J.M.") § 9-10.000 *et seq*) and obeyed the statutory requirement to file an NOI a "reasonable time before trial." Indeed, when the government filed its NOI, the Court did not have a trial date on calendar, distinguishing this case from those cited by Defendant as a basis for a finding of tardiness. *Cf. United States v. Constanza-Galdomez*, 787 F. Supp. 3d 131, 144 (D. Md. 2025) (holding "109 days . . . patently insufficient to develop a capital defense"), *United States v. Spurlock*, 782 F. Supp. 3d 987, 1019 (D. Nev. 2025) (holding "a defendant cannot prepare for a capital trial with only 12 days of notice"); *United States v. Merrell*, No. CR 3:20-CR-46-1, 2025 WL 2911170, at *2 (N.D.W. Va. Oct. 7, 2025) (finding seven months of notice insufficient); *United States v. Dangleben*, No. 3:23-CR-0072, 2025 WL 2647195, at *2 (D.V.I. 2025) (finding five months of notice insufficient); *United States v. Cole*, 799 F. Supp. 3d 438, 465 (D.V.I. 2025) (finding 52 days insufficient).

## II. STATEMENT OF THE CASE

### A. Description of the Offense

On March 27, 2022, in Navarre, Florida, Defendant kidnapped Individual-1, the mother of his three-year-old daughter. As captured in surveillance video, Defendant arrived early for the meeting, purportedly arranged to transfer custody of the child to Individual-1, though the child was not present. When Individual-1 arrived, she and Defendant entered a utility trailer attached to his truck. About 30

minutes later, Defendant exited the trailer alone, shut the door, and drove the truck and trailer to retrieve the child, who had stayed with Defendant's friends. The next day, Defendant drove Individual-1 about 300 miles to St. Clair County, Alabama. On April 2, 2022, police searched the St. Clair County property, where Defendant had stayed, and found Individual-1's body in a shallow grave inside a barn. The remains were wrapped in a blanket secured by ratchet straps. Due partially to the body's decomposition, an autopsy failed to identify a cause of death, though the medical examiner found Defendant's DNA under one of the Individual-1's fingernails.

The investigators in Alabama observed that Defendant had an injury below one eye and scratches on a hand. Investigators later collected Home Depot security video that showed an uninjured Defendant purchasing ratchet straps (matching those found on the body) in the hours before the kidnapping. In a non-custodial interview on March 29, 2022, Defendant said that Individual-1 hit him, but he did not hit her. He denied knowing Individual-1's location, claiming to have given her a ride the night of March 27 because her car was inoperable. He said he let Individual-1 out of his vehicle on a highway after she became upset with something on his phone. During a subsequent interview, Defendant acknowledged that the child had not accompanied him to the supposed custody exchange. He said the child was not there because he wanted to discuss a financial matter with Individual-1. He also conceded

he had disposed of Individual-1's phone the day after the purported custody exchange. He said he found it in his truck while driving to Alabama and threw it out the window because it was not his responsibility.

Defendant had a financial motive to kill Individual-1. He was in arrears of his child support obligations to her, as reflected in a judgment entered about two weeks before the crime.

**B. Procedural History**

On January 24, 2023, a grand jury in this district returned an indictment that charged Defendant with the death-eligible crime of kidnapping resulting in a death (18 U.S.C. § 1201(a)(1)). Dkt. 1. On February 13, 2023, the Court issued a standard scheduling order. Dkt. 10. On February 27, 2023, the government filed a notice indicating that it would not seek the death penalty. Dkt. 12.

On May 10, 2023, the court granted Defendant's first unopposed motion (Dkt. 14) to declare the case complex, continue the trial date, and extend pretrial deadlines. Dkt. 15. The Court excluded time attributable to the continuance under the Speedy Trial Act and stated that a trial date would be set later. *Id.* Following a June 13, 2023, status conference, the Court extended pretrial motions until November 13, 2023, and ordered the parties to notify it by that deadline whether they would be ready to proceed to trial. Dkt. 16. On October 23, 2023, the Court granted a joint request (Dkt. 21) to extend pretrial deadlines until February 12, 2024, and ordered the parties

to notify it by February 12, 2024, whether they would be ready for trial. Dkt. 22. The Court noted Defendant had previously waived his speedy trial rights and stated a trial date would be set later. *Id*. On November 9, 2023, Defendant's counsel moved to withdraw after discovering a conflict of interest. Dkt. 24. The motion was granted November 15, 2023 (Dkt. 27), and the government provided all previous discovery to the newly appointed attorney.

On February 1, 2024, the Court granted Defendant's second unopposed continuance motion (Dkt. 29), extended pretrial motions until May 17, 2024, and ordered the parties to notify it by May 17, 2024, whether they were ready for trial. Dkt. 30. The Court noted counsel was recently appointed and that Defendant had previously waived his speedy trial rights. *Id.*

On March 19, 2024, the Court denied without prejudice Defendant's motion for additional appointed counsel. Dkt. 38. On May 10, 2024, the Court granted Defendant's third unopposed motion for continuance (Dkt. 40) and extended pretrial motions until August 19, 2024, when the parties were to announce their readiness for trial. Dkt. 41. The order noted Defendant had previously waived his speedy trial rights. *Id.* On August 22, 2024, the Court granted Defendant's fourth unopposed continuance motion (Dkt. 43) and extended pretrial motions until December 13, 2024, when the parties would announce their readiness for trial. Dkt. 45. The order stated a trial date would be set later and noted, again, that Defendant had previously

waived his speedy trial rights. *Id.* On December 13, 2024, the government moved in limine to preclude Defendant from offering improper evidence or argument. Dkt. 46. Five days later, the Court set a trial date of April 28, 2025. Dkt. 47.

On January 20, 2025, President Trump issued Executive Order 14164. Ex. A. On February 5, 2025, consistent with the executive order, Attorney General Bondi issued a memorandum directing a review of decisions not to seek the death penalty issued by the prior administration. Ex. B. In mid-February 2025, the government notified Defendant of the review and offered him a reasonable time to present information that might bear on the decision. Dkt. 49. On February 24, 2025, Defendant sought the appointment of learned counsel (*see* 18 U.S.C. § 3005) and a trial continuance. *Id.* On March 10, 2025, the Court granted Defendant's motion, vacating the trial date, appointing Jeffrey L. Ertel as learned counsel, and directing the government to file an NOI by July 7, 2025. Dkts. 50-51.

On April 4, 2025, learned counsel moved to extend the NOI deadline by 60 days, so that the defense could have more time to prepare its presentation to the Department of Justice. Dkt. 53. On April 8, 2025, the Court granted Defendant's motion and ordered the government to file any NOI by September 5, 2025. Dkt. 54. The Court excluded the delay from any subsequent computation of a necessary trial date. *Id.* On April 17, 2025, Defendant successfully moved for appointment of a mitigation specialist (Dkt. 58) and approval of a capital case defense budget. Dkt.

60. On April 30, 2025, the government furnished all previously provided discovery to Mr. Ertel and Ms. Ivey.

On June 24, 2025, the Court granted Defendant's sealed motion (Dkt. 75) to extend the NOI deadline again. Dkt. 76. The Court ordered the NOI filed by October 5, 2025, and excluded the resulting delay from any subsequent trial date computation. *Id.*

Defendant met with, and presented mitigation information to, representatives of the Justice Department on July 24, 2025. On September 16, 2025, the government obtained a superseding indictment that included a Notice of Special Findings (death penalty eligibility allegations). Dkt. 77. On October 5, 2025, the government timely filed its NOI. Dkt. 79.

On October 29, 2025, the Court ordered the parties to consult and submit a proposed scheduling order and trial date. That day, the government provided a model schedule to defense counsel, seeking feedback by November 10, 2025, and proposing a joint submission by November 17, 2025. On November 14, 2025, the government provided a draft proposal to Defendant, seeking proposed edits by November 19, 2025. During a phone call on November 20, 2025, defense counsel said they would respond by November 24, 2025. On Friday November 21, 2025, defense counsel notified the government that they expected to file a motion to strike the NOI by January 5, 2026, and opposed a scheduling order beforehand. The

government nonetheless filed its proposed order, which would set a trial date of April 5, 2027. Dkt. 93. Defendant responded, noting his intention to seek a vacatur of the NOI that he hoped would take precedence over scheduling. Dkt. 96. He also claimed he could not prepare a mitigation case by April 5, 2027. *Id.* In reply, the government requested a modification of its proposed schedule to accommodate the motion to strike without moving the trial. Dkt. 97.

Defendant filed his motion to strike the NOI on January 5, 2026. Dkt. 99. This Opposition follows.

## III. <u>ARGUMENT</u>

### A. The Government's "no-seek" notice was revocable.

Defendant claims that, as a matter of law, an initial decision not to seek the death penalty is irrevocable. Dkt. 99 at 14. The government disagrees. The initial no-seek decision was revocable at any reasonable time prior to trial, as limited only by § 3593.

#### *i. The government may seek the death penalty at any reasonable time before trial.*

The "executive Power" is vested in the President, who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; § 3. Moreover, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 at 693 (internal citations and

quotation marks omitted). Consistent with that authority, the Attorney General and the United States Attorneys enjoy "broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal citations and quotation marks omitted); *see also United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (holding "courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"). This discretion "includes the decision whether to seek the death penalty." *United States v. Slone*, 969 F. Supp. 2d 830, 834 (E.D. Ky. 2013); *see McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987).

The Executive Branch's discretion is not unlimited. The Constitution prohibits selective prosecution in violation of equal protection, *see Armstrong*, 517 U.S. at 464, and vindictive prosecution in violation of due process, *Goodwin*, 457 U.S. at 372-73. Outside those limits, "[a] prosecutor may seek a superseding indictment at any time prior to a trial on the merits." *United States v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006) (quotation omitted). "An initial decision" to bring or forgo charges "should not freeze future conduct." *Goodwin*, 457 U.S. at 382.

In harmony with the Executive Branch's broad authority in charging, the FDPA places only one limitation on the filing of an NOI, that the government do so "a reasonable time before the trial or before acceptance by the court of a plea of guilty." § 3593(a). From that point, the statute limits amendments of the NOI to

occasions on which the government shows "good cause." *Id.* Notably, the FDPA does not contemplate a "no-seek" notice and does not bar an NOI if the government initially announces it will not pursue capital punishment. Thus, neither the Constitution nor the FDPA require permission to reverse a no-seek decision. *Cf.* Dkt. 99 at 15. Notably, a decision to seek the death penalty has less impact under the Constitution than the addition of a new charge. *See United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004) (declining to find vindictiveness in pursuit of the death penalty on retrial following withdrawal of the NOI in the first proceeding because the government did not "intend to bring a more serious charge . . . in the second trial").

Defendant's claim contradicts fundamental principles of statutory construction when he argues that § 3593(a) regulates the government's notices that it will not seek the death penalty: courts may not revise statutes to conform to perceived policy goals. *See, e.g., Patel v. Garland*, 596 U.S. 328, 346 (2022) (observing "we inevitably swerve out of our lane when we put policy considerations in the driver's seat" as "policy goals cannot trump the best interpretation of the statutory text"); *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) (holding "this Court normally seeks to afford the law's terms their ordinary meaning"); *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 188 (2020) (finding that "if policy considerations suggest that the current scheme should be altered, Congress must be

the one to do it."). Courts "may depart from the text of a statute when its plain meaning produces absurd or futile results," but they rarely do so to "override unambiguous legislation." *United States v. Crape*, 603 F.3d 1237, 1245 (11th Cir. 2010) (internal citation and quotations marks omitted); *see United States v. Pate*, 84 F.4th 1196, 1205 n.3 (11th Cir. 2023) (limiting the absurdity doctrine to "rare and exceptional circumstances" when Congress's literal meaning appears in conceivable).

Here, no absurdity exists. The FDPA requires good cause only to amend an NOI, not to revisit a decision to forgo a capital prosecution, and Defendant should not succeed in asking this Court to amend the statute for his benefit. His reliance on three distinguishable opinions fails to buttress his request for a reimagination of the FDPA. He cites *Spurlock*, in which the district court struck an NOI filed 12 days before trial, long after a deadline for such a filing had lapsed. 782 F. Supp. at 1016. The *Spurlock* court did not, however, hold a decision to forgo the death penalty irrevocable. *Id.* at 1006-07 (observing "the Court did not interfere with the government's penalty decision . . . . [it] set a reasonable deadline . . . and expected compliance").

Likewise, Defendant misplaces his reliance on *United States v. Waggoner*, 339 F.3d 915 (9th Cir. 2003). The *Waggoner* court decided "whether the defendant's right to be represented by two attorneys is extinguished once the threat of capital

punishment has been irrevocably removed . . . ." 339 F.3d at 917. It did not decide when the government had "irrevocably" abandoned the death penalty but assumed it had done so for purposes of the decision. *Id.* at 919 (holding that the defendant no longer has a statutory right to a second court-appointed attorney when he is no longer subject to the death penalty). For want of any judicial decision about the threshold of irrevocability, the opinion has no precedential value for that proposition. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) (holding that issues that merely lurk in the record without rulings "are not to be considered as having been so decided as to constitute precedents").

For much the same reason, Defendant fares no better in citing *United States v. Suarez,* 801 F. Supp. 3d 872 (N.D. Cal. 2025). *Suarez* considered an uncontested defense motion to terminate the appointment of learned counsel after the government announced it would not seek the death penalty and after an NOI deadline had lapsed. *Id.* at 874-75. Significantly, the *Suarez* court implied that only the passing of its deadline rendered the government's decision reliable enough to justify termination of learned counsel. *Id*. at 880. In that regard, the opinion favors the government, which filed its NOI in this case before any court-set deadline had passed.

Defendant, while admitting that the text of the FDPA does not require the government to file "formal notice" of its decision not to seek the death penalty, states that notice is implicitly required by the Justice Manual. But the Justice Manual does

not create or confer any rights enforceable by a defendant. To the contrary, J.M. § 1-1.200 states the document "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter." J.M. § 1-1.200; *see United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001); *see also Nichols v. Reno*, 124 F.3d 1376, 1377 (10th Cir. 1997) (rejecting a defendant's premise that the Justice Manual provides a "protectible interest"). Regardless of the Manual's reach, it requires only that the government "promptly inform" the court and counsel of a decision not to seek capital punishment. J.M. § 9-10.150. It does not require a filing, much less imply that an initial decision to forgo the death penalty precludes reconsideration under any and all circumstances.[1] The latitude to reevaluate a capital case sounds with the executive's "authority and absolute discretion to decide whether to prosecute." *Nixon*, 418 U.S. at 693. Indeed, the only meaningful limit on the government's discretion to reevaluation resides in the FDPA requirement for timely NOIs.

*ii. The Court should not create a procedural rule to bar the government from revisiting a decision not to seek the death penalty.*

Defendant asks the Court to "create a procedural rule" under its "supervisory authority" that "once the government has filed a formal notice of its intent not to

[1] The converse is equally true. The government does not chisel NOIs in stone and provides itself with latitude to amend or withdraw them before trial. *See* J.M. § 9-10.160.

seek the death penalty, it may not thereafter seek the death penalty." Dkt. 99 at 6-7. 18.

In characterizing his proposed rule as "procedural," Defendant mischaracterizes his request. In fact, he proposes a "substantive" rule that would limit the Executive Branch's charging authority, in clear derogation of *Nixon* and its progeny. Indeed, any such limitation must come from the Legislature, and Congress has thus far only limited the government in its death penalty decision making via the reasonable timeliness requirement of § 3593(a). *See e.g., United States v. Fokker Servs.* B.V., 818 F.3d 733, 738 (D.C. Cir. 2016) (explaining that the Speedy Trial Act does not give authority to the district court to reject a deferred prosecution agreement as too lenient); *United States v. Torres*, 318 F.3d 1058, 1064 (11th Cir. 2003) (holding that 18 U.S.C. § 3292 did not give prosecutors "unlimited discretion" in deciding what constitutes a "final act" in foreign evidence requests for purposes of determining statute of limitations suspensions); *U.S. ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp*., 151 F.3d 1139, 1144–45 (9th Cir. 1998) (explaining that the *qui tam* statute provides a limited check on prosecutorial discretion to ensure that actions are not dropped without a legitimate governmental purpose). *See also United States v. Stone*, 394 F. Supp. 3d 1, 10 (D.D.C. 2019) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case. The Attorney General and his designees are authorized to discharge this duty by

statute . . . . Consequently, the Attorney General . . . retain[s] broad discretion to enforce the Nation's criminal laws. . . ." (citing *Nixon*, 418 U.S. at 693-94; *Armstrong*, 517 U.S. at 464).

This Court should not grant Defendant's request, which would place unfounded limitations on the government's charging decisions. Doing so would constitute an abuse of its supervisory authority.[2]

**B. The government timely filed its NOI.**

Defendant argues this Court should strike the NOI as untimely. Dkt. 99 at 18. The request should be rejected. The FDPA's "reasonable time" requirement for NOI filing protects defendants' rights by ensuring "adequate time to prepare [a] defense." *United States v. Wilk*, 452 F.3d 1208, 1223 (11th Cir. 2006); *see United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003) (holding the rule ensures "the accused will not be required to stand trial for his life without having received adequate notice").[3] To determine whether an NOI filing satisfies § 3593(a), this Circuit considers a non-

---

[2] Such a rule would preclude the government from changing a "no seek" to a "seek" even when new evidence arises that would support a change (*e.g.* newly discovered proof of an additional homicide or other serious violent criminal conduct).

[3] *See also United States v. Robinson*, 473 F.3d 487, 492 (2d Cir. 2007) (noting this requirement's "purpose of allowing the defendant to prepare his case".); S. Rep. No. 101-170, at 21 (1989) (explaining the "reasonable time" requirement of a precursor to the FDPA would ensure adequate notice to prepare for sentencing and to conduct voir dire).

exhaustive list of factors[4] to determine the "objective reasonableness of the time" between the filing and trial. *Wilk*, at 1221 ("We first conclude that the applicable test is one of objective reasonableness.").

In this case, however, the government filed its NOI before the Court set a trial date. As such, no basis exists for concluding the government failed to provide Defendant with adequate time to prepare for trial under § 3593. *See Ferebe*, at 740 ("[W]ithout a date from which to measure the amount of time remaining from the filing to trial, a court cannot reach conclusions as to the objective reasonableness of that yet unknown and unidentified interval."). Even if the government had filed the NOI at a time that provided Defendant with inadequate preparation time, this Circuit's law would dictate a continuance rather than a prohibition on pursuit of the death penalty:

> Section 3593 is silent as to the remedy for [an untimely] Death Notice. Nonetheless, the obvious purpose of the § 3593(a) notice requirement is to make sure a defendant has adequate time to prepare for a death defense. . . . Where a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate.

[4] The courts consider "the totality of the circumstances," including, but not limited, to: (1) what transpired before the notice; (2) the time remaining for trial; (3) the status of discovery and motions; (4) the nature of the charges; (5) the nature of the alleged aggravating factors, and (6) the anticipated nature of the defense, if known. *Wilk*, 452 F.3d at 1221.

*Wilk*, 452 F.3d at 1223. A contrary rule, one that measures only the interval from the NOI to an existing trial date, "unduly restricts the district court's ability to manage its cases and is simply not required by § 3593(a)." *Id*. at 1224.

Any evaluation of Defendant's capacity to prepare for trial should begin with government's proposal to commence the proceeding on April 5, 2027. That date would provide him with approximately 18 months to prepare and would patently satisfy the objective reasonableness standard. *See Wilk*, 452 F.3d at 1225 (finding six months was reasonable); *United States v. Le*, 311 F. Supp. 2d 527, 534-35 (E.D. Va. 2004) (finding 113 days reasonable); *United States v. Ponder*, 347 F. Supp. 2d 256, 270 (E.D. Va. 2004) (finding four to five months reasonable). But that analysis appears unnecessary, as Defendant concedes he cannot be prejudiced because of an insufficient amount of time to prepare. Dkts. 99 at 19-20. Instead, he argues the government's delay in pursuing the death penalty prejudiced him because he detrimentally relied on the initial announcement of a non-capital prosecution and declined mitigation investigations that are now foreclosed. Dkt. 99 at 22-23.

Defendant's detrimental reliance theory does not sound with this Circuit's prevailing authority on timeliness drawn from *Wilk*. As noted, that opinion focuses on the reasonableness of time between the NOI filing and trial. *See* 452 F.3d at 1225. Because Defendant's claim relies on a retrospective analysis, it bears a resemblance to assertions of error made under doctrines like pretrial delay or spoliation of

evidence. Those lines of authority focus on the bad faith of government actors, something Defendant cannot establish here.

*i. The government did not act deliberately to gain an unfair advantage.*

Defendant claims that in reliance on the initial no-seek notice, he lost an opportunity to develop mitigation evidence, including: (i) interviewing Defendant's father, Roberto Spanevelo, who died in October 2025; (ii) interviewing Defendant's former girlfriend, A.J., who now wants nothing to do with Spanevelo; (iii) developing better rapport and trust with Spanevelo's family, and other potential mitigating witnesses who are angry about the NOI; and (iv) observing and documenting signs of Defendant's mental impairment at the time of his arrest and securing the assistance of a mental health expert at the start of the case. Dkt. 99 at 25-30.

As noted, Defendant's argument most closely approximates an assertion that the government did not timely charge him. Charging delays receive limited protection under the Due Process Clause of the Fifth Amendment. *See United States v. Lovasco*, 431 U.S. 783, 789 (1977). Such a delay violates due process only if it prejudices the defense and the government purposefully deferred charging to gain a tactical advantage. *United States v. Hurtado*, 89 F.4th 881, 897 (11th Cir. 2023) (citing *United States v. Gayden*, 977 F.3d 1146, 1150 (11th Cir. 2020) and *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996)). Similarly, the government

bears responsibility for the loss of evidence when its bad faith actions result in the destruction of exculpatory information. *See Arizona v. Youngblood*, 488 U.S. 51 (1988); *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011) (requiring proof that "the evidence was likely to significantly contribute to his defense" and "the loss . . . was a result of [governmental] bad faith"). Of course, the government bears responsibility for the loss of evidence only when it controlled it directly or through an agent (*see Bullock v. Carver*, 297 F.3d 1036, 1056–57 (10th Cir. 2002)), a circumstance Defendant does not allege here. Nonetheless, the spoliation doctrine's scienter requirement remains illustrative of Defendant's burden.

Defendant has not marshaled any evidence that the government delayed the filing of the NOI with an aim to deprive him of any advantage. Indeed, the timing of the NOI stemmed from case-neutral, agency-wide, directive to revisit the death penalty decisions of the prior administration. After the President issued Executive Order 14164 (Ex. A), the government immediately notified Defendant it was reconsidering the death penalty. Dkt. 49. As noted, the government agreed to Defendant's request to extend the NOI deadline (Dkt. 54, 76), which provided him with additional time to prepare mitigation. Moreover, Defendant bears responsibility for virtually all the delay preceding the re-evaluation of the death penalty decision, as he sought five trial continuances. *United States v. Ogiekpolor*, 122 F.4th 1296, 1306 (11th Cir. 2024) (holding that in the face of defense requests

for continuances "we cannot say that the reason for the delay weighs against the government."); *See United States v. Louis*, 146 F.4th 1328, 1338 (11th Cir. 2025) (same).

In any event, Defendant cannot show that the claimed loss of evidence prejudiced him. *See United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993) (premising a due process violation on a showing that lost "evidence was likely to significantly contribute to [the] defense"). He makes vague and speculative claims that his father might have possessed "a wealth of information" and "knowledge of the family's history." Dkt. 99 at 28. However, that baseless assertion contradicts prior descriptions of the parent. In a mitigation submission to the Department of Justice, Defendant stated that his mother, Lu, left Defendant's father when Defendant was 18 months old. According to the submission, Defendant had only three—unpleasant—interactions with his father thereafter.[5] Defendant lived geographically separate from his father and regarded his stepfather as his actual parent. As such, Defendant cannot show that the loss of access to his father prejudiced him, much less that the government could have foreseen the man's death or any arguable value

[5] At the age of two, Defendant was kidnapped by his father, who returned him after the police intervened. Ten years later, the father kidnapped Defendant again, only to surrender the boy to police for a second time. At age 20, Defendant set out to visit his father's family for about a week. He returned early because his father and others were abusing drugs.

he might have had to the defense. In any event, Defendant can obtain family history information through his mother and stepfather. *Cf. California v. Trombetta*, 467 U.S. 479, 490 (1984) (rejecting a spoliation finding because "it does not follow that respondents were without alternative means of demonstrating their innocence").

Defendant fails to explain why his investigator, who visited Brazil in June 2025, did not interview his father given her belief that "capital clients' parents are usually the most important source of mitigation about the clients." Dkt. 99 at 26. She notes Defendant's father lived about 1044 miles from the city she chose to visit, Rio de Janeiro. *Id.* But despite seven days in Brazil, she could not find time for a two-hour flight to interview a witness the defense now characterizes as critical. *See Id.* More to the point, Defendant offers no explanation why an investigator could not have simply phoned this allegedly important witness.

Defendant offers even less information with respect to the value of his former girlfriend's foregone assistance to his case. He claims she might very likely possess "critical, first-hand information about his functioning and behavior" because she dated Defendant at the time of the incident. Dkt. 99 at 28. Whatever value she might have had to the defense, the government had no reason to have foreseen it much less to have purposely thwarted it. Moreover, it would be reasonable to presume that she would have—at an absolute minimum—grown skeptical of Defendant upon hearing credible accusations that he murdered his ex-wife. As such, Defendant's argument

about the impact of delay cannot overcome the intuitive notion that his arrest for the murder of another romantic partner tended to diminish his paramour's willingness to assist him.

With respect to the claim that the timing of the NOI dissuaded the defense from mental health evaluations (Dkt. 99 at 29), Defendant cannot show governmental bad faith. The government has no reason to suspect Defendant suffers from a mental illness. In any event, Defendant's mental health remains subject to investigation. Defendant offers no support for his naked assertion that some "critical period" for evaluation has lapsed. Dkt. 99 at 29. He remains free to retain experts and investigate whether he suffers from any potentially mitigating or exculpatory mental illness.

In the absence of any legally cognizable showing of a belated NOI, Defendant unpersuasively resorts to assertions that the timing of the notice precludes him from offering an effective defense. He has failed in any way to demonstrate as much, nor has he shown that he could meaningfully attribute the supposed fault to the government.[6]

[6] Defendant also claims he lacked sufficient time to prepare mitigation for Department of Justice decision makers. Again, he has no rights at all under the decision-making process. *See* J.M. § 1-1.200. Even if he did, the Department delayed meeting with counsel at their request.

*ii. The government's charging decision has not unfairly burdened defense counsel.*

Defendant argues the government's recent decision to pursue the death penalty has forced his counsel to rethink their strategy. Dkt. 99 at 30-31. Defendant fails to identify a legal theory upon which he could establish a right to counsel untroubled by the government's discretion to charge crimes as it sees fit.

In support of his prejudice argument, Defendant cites to American Bar Association's ("ABA") guidelines for capital defense counsel for the proposition that he should have been able to develop an "integrated defense" theory that took into consideration culpability and mitigation. Of course, the ABA guidelines are "only guides to reasonableness, not its definition." *Bobby v. Van Hook*, 558 U.S. 4 (2009) (chiding the lower court for treating the guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands"). Given that the guidelines do not bind defense counsel as a legal matter, they certainly do not represent a restraint on prosecutorial decision-making.

In any event, nothing prevents defense counsel, appointed in March 2025, from preparing an integrated defense now given the ample time remaining before the government's proposed trial date—April 5, 2027. Indeed, counsel may request a later date if needed to prepare an adequate defense, and the defense's reliance on distinguishable authority fails to demonstrate otherwise. *Cf. Constanza-Galdomez*,

787 F. Supp. 3d at 144 (finding 109 days inadequate to prepare a capital defense) *United States v. Spurlock,* 782 F. Supp. 3d at 1019 (finding 12 days inadequate).

To the extent an adequate defense might involve integration of the culpability and mitigation theories, the NOI has not altered the government's proof of guilt, and Defendant enjoys the benefit of timely and complete discovery disclosures on that score. *See* Section II, *supra* pp 5-9. Unsurprisingly, Defendant fails to specify the "[d]ecisions – big and small" that have impaired counsel's alleged ability to prepare. Dkt. 99 at 32. These vague accusations fail to establish prejudice. As such, Defendant simply asks the Court to speculate what counsel might have done differently if faced with the death penalty sooner. But Defendant omits offering any detail when he complains about counsel's witness interviews and choice of experts. He does not establish that counsel could not revisit any of the efforts made in these regards to address the NOI now confronting him. Simply put, Defendant proves nothing of consequence by asserting counsel would have acted differently under different circumstances.

*iii. Defendant had no right to a plea bargain.*

Defendant argues the government's recent decision to pursue the death penalty deprived him of an opportunity to resolve his case with a non-capital plea bargain. Dkt. 99 at 32. Defendant fails to identify a legal right to plea negotiations that the government has violated.

Criminal defendants do not have a right to "be offered a plea, nor a federal right that the judge accept it." *Missouri v. Frye*, 566 U.S. 134, 148-49 (2012) (citations omitted). To the extent Defendant wanted to pursue a plea, he could have solicited an agreement. Significantly, he could have made efforts to resolve his case at any point during the two years following the government's notice that it would not seek the death penalty, but he did not. Dkts. 99 at 33-34. For that matter, he remains free to offer a plea. But his pursuit of a strategy centered on trial does not redound to the government or, for that matter, amount to any sort of cognizable error by his attorney. In support of his theory, Defendant again resorts to the ABA guidelines, stating that capital defense attorneys are required "to explore a plea agreement." Dkt. 99 at 34. As noted, the guidelines do not constitute binding law and appear especially inapt here, and as Defendant implies, they would also control in a non-capital case.

Moreover, Defendant cannot succeed by implying that an unforeseen change of circumstances—the political fallout of an election two years after the decision not to seek the death penalty—might provide the basis for demonstrating defense counsel's ineffectiveness. Effective assistance includes a wide range of actions and "'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland v. Washington*, 466

U.S. 668, 690 (1984)). The adequacy of performance contemplates the reasonableness of counsel's actions under prevailing circumstances, keeping in mind that a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). Here, however, Defendant premises his entire argument on hindsight, claiming what counsel would have, or should have, done under a different set of circumstances. The argument fails on its face.

*iv. Defendant remains untouched by cruel and unusual punishment.*

Defendant next argues that the government's decision to reverse its initial no-seek decision constitutes cruel and unusual punishment, claiming it constituted wanton inhumane conduct that resulted in significant psychological harm in violation of the Eighth Amendment. Dkt. 99 at 35. Defendant's claim lacks any basis in law or reason.

The Eighth Amendment's "purpose is not to require that criminal prosecutions be filed within a certain length of time." *United States v. MacClain*, 501 F.2d 1006, 1013 (10th Cir. 1974). To support his contention, Defendant relies on inapposite authority, *United States v. Green*, No. 12-CR-83S (1)(2)(3), 2018 WL 786185 (W.D.N.Y. Feb. 8, 2018) (W.D.N.Y. Feb. 8, 2018), *aff'd sub nom. United States v. Black*, 918 F.3d 243 (2d Cir. 2019). In *Green*, the court observed that a Sixth Amendment speedy trial violation resulted in unwarranted anxiety for the accused.

*Id.* at *10. The opinion recognizes, intuitively, that the Speedy Trial guarantee operates as a bulwark against such distress. *Id*. at *6 (citing *United States v. Ewell*, 383 U.S. 116, 120 (1966)). None of that authority, however, converts a delayed charging decision into a "punishment" within the Eighth Amendment.

To state an Eighth Amendment claim, Defendant must satisfy two elements, one subjective and one objective. First, he must show subjectively that the government acted with a "sufficiently culpable state of mind." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks omitted). Second, he must show the conduct at issue was objectively "harmful enough" or "sufficiently serious" to reach constitutional dimensions. *Id*. at 8, 20. Defendant makes no effort to establish either prong of an Eighth Amendment violation. He complains, in essence, about disappointment at having his emotional expectations undermined by a change of policy priorities, not by any conduct designed to harm him unnecessarily. Accordingly, he could not establish an Eighth Amendment violation, even if that provision applied in this context.

*v. Defendant suffered no presumptive prejudice under the Sixth Amendment.*

Defendant argues that the government's decision to seek the death penalty 951 days after its no-seek notice has "presumptively prejudiced" him. Dkt.99 at 36. In support of this position, he cites *Doggett v. United States*, 505 U.S. 647 (1992). In

that case, the Supreme Court found a Sixth Amendment speedy trial violation stemming from an eight-and-a-half-year pre-trial delay caused by official negligence: "For six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes." *Id.* at 652-53.

*Doggett* expressly concerns a defendant's Sixth Amendment right to a speedy trial, not to an efficient resolution of the government's charging decisions, including the filing of an NOI. *Id.* at 671. In any event, Defendant fails to allege, much less establish, any governmental negligence like that at issue in *Doggett*. Any speedy trial delays stem from Defendant's actions: from February 2023 through February 2025, Defendant sought four unopposed continuances and joined the government in a fifth. Dkts. 14, 21, 29, 40, and 43. The Court had set a trial once in this case, calendaring it to begin in April of 2025 (Dkt. 47), only to vacate the date in response to a defense motion for continuance. Dkts. 50-51. As such, Defendant cannot show any delay stemming from governmental negligence. Devoid of facts that might place his contention within *Doggett*, he can only imply that a newly elected administration changes priorities at its peril. He has, however, failed to identify a shred of legal support for that novel notion. The government's more aggressive approach to the death penalty in this case stems from a broad change in policy

dictated from the highest reaches. Such a change reflects a feature of this democracy not evidence of malfeasance.

Even if Defendant had identified governmental negligence akin to that in *Doggett*, he could only make out a successful speedy trial claim by satisfying the longtime balancing test for such allegations: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett*, 505 U.S. at 651 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). Because Defendant is responsible for the lion's share of delay, and cannot attribute any of it to official negligence, he cannot succeed in asking this Court to presume prejudice on his behalf. The far shorter delay at issue in this case only serves to underscore the inappropriateness of importing *Doggett's* presumption of prejudice. *See id*. at 652 (observing "the presumption that pretrial delay has prejudiced the accused intensifies over time").

Moreover, Defendant's claim that the original no-seek decision should be enforceable implies that the no-seek decision was part of an agreement or obligation under a contract. To the contrary, the decision to file a no-seek notice was not the result of any bargain between the government and Defendant. Prior to the filing of the no-seek notice, the government never made any promises with respect to how it

would proceed. The action was taken voluntarily and unilaterally. The cases which defense counsel cites are not applicable to the circumstances of this case. *See Santobello v. New York,* 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972 ) (finding that there was evidence of an agreement when defendant pleaded guilty in exchange for cooperating and fully performed his end of the bargain); *Harris v. City of Phila*., 47 F.3d 1311, 1323 (3d Cir. 1995) ("Consent decrees are interpreted under ordinary contract law principles.").

Because Defendant provides no support – either factual or legal – to buttress his claim that he was presumptively prejudiced, his speedy trial claim should fail.

**C. The government may file an NOI without establishing good cause after previously announcing it would not seek the death penalty.**

Defendant argues the Court should strike the NOI because the government cannot show "good cause" for its recent decision. Dkt. 99 at 39. He implies that the government filing that announced the original decision triggered § 3593(a)'s "good cause" requirement for any subsequent "amendment." *Id.* at 40-41. For reasons already offered, this argument too should be rejected. *See supra* Arg. A.

Section 3593(a) does not require or contemplate filings in which the government announces it will forgo a capital prosecution. The provision, and its "good cause" requirement, apply only to notices of intent *to seek* the death penalty. In fact, the FDPA makes no mention of a "no-seek notice," undermining any claim Congress intended to apply the good cause standard to documents that announce the government desire for a non-capital trial. *Cf.* Dkt. 99 at 40-41 (citing *Constanza-Galdomez*, 787 F. Supp.3d at 146-47; *Spurlock*, 782 F. Supp.3d at 1014); *Dangleben*, 2025 WL at *6). These arguments fail in the face of the judiciary's limited authority to construe § 3593(a), a statute the Court ought not reconceive out of whole cloth based on Defendant's assertion of legislative intent. *See Patel*, 596 U.S. at 346 (observing "we inevitably swerve out of our lane when we put policy considerations in the driver's seat"). The statute clearly and unambiguously contains no mandate for a "good cause" showing for an initial NOI, even one that follows a decision not to seek the death penalty. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (holding that "[t]he inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent) (*citing Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

The FDPA's omission of a procedure to announce a decision not to seek the death penalty presumably reflects the fact that Congress did not dictate, or perhaps even foresee, the Department of Justice's desire to affirmatively consider the death

penalty in every eligible case. *See* J.M. § 9-10.010. That self-imposed duty,[7] which serves a desire for fairness and consistency, ought not become the basis of some further obligation, supposedly implied by a Legislature, that apparently failed to foresee that the Executive Branch might oblige itself to decide not to seek the death penalty. Indeed, and contrary to Defendant's assertion, the "good cause" standard does not serve to check a mercurial government from changing its mind about the death penalty. *Cf.* Dkt. 99 at 44. It ensures against deliberate delay by the government and concomitant prejudice to the defendant. *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999). And, as repeatedly asserted above, Defendant has not and cannot show deliberate delay or prejudice, nor has he identified any inadequacy in the notice or its timing relative to the proposed trial.

Defendant likewise fails in asserting that the government, unrestrained by the "good cause" requirement, could unduly delay proceedings or later change its position without cessation. Dkt. 99 at 45. Defendant's Sixth Amendment speedy trial and Fifth Amendment double jeopardy rights provide ample protection against the parade of horribles he imagines.

[7] Defendant again argues the Justice Manual implies an obligation to file a no-seek notice, triggering the "good cause" standard. Dkt. 99 at 42. But as pointed out above, the Justice Manual does not create any rights J.M. 9-1.150. Moreover, it does not dictate any form of notice. The government could have as easily announced its decision orally as it did in writing. It could have said nothing at all and simply allowed the case to proceed to a non-capital trial.

Defendant also attempts to freight affirmative no-seek decisions with greater weight than they merit. He asserts that they operate as a fulcrum for the right to learned counsel under 18 U.S.C. §§ 3005, 3593, and 3599(a) and thereby contemplate the fair administration of justice. Defendant suggests that 18 U.S.C. § 3593 must be interpreted as including a "good cause" requirement for the government to change from a "no seek" decision to "seek," else courts could not implement §§ 3005 and 3599(a). Dkt.99 at 46. But the basis for this assertion is not at all clear. When a defendant is charged with a capital crime, he may request that the court appoint learned counsel under § 3005. But the court is not, at that juncture, required to fully fund a defense effort to prepare the sort of mitigation case it would present to a jury in a capital trial, and nothing in §§ 3005 or 3599 is to the contrary.

The "multiple time-consuming and costly obligations" the defense complains about (Dkt. 99, at 46), e.g., funding for experts, mitigation specialists, etc., could more profitably await the filing of a death notice under § 3593, when it becomes clear the case will proceed to capital trial. And § 3593's "reasonable time" requirement provides the time needed for the defense to assemble its team and prepare for capital trial. Thus, §§ 3005, 3593, and 3599 work in harmony precisely as written by Congress, without the court reading into § 3593 an obligation not found within its text.

**D. Any alleged speedy trial delay is attributable to Defendant.**

Defendant claims that the seek notice violates his Sixth Amendment speedy trial right as it would necessitate additional delays in resolving the case. Dkt. 99 at 47-48. Though he sought multiple trial continuances and extensions of time, Defendant seeks to attribute the delays to the government. *Id.* at 49. Defendant's claim is unsupported by the facts and fails as a matter of law.

Defendant made the same unpersuasive argument when he asserted presumptive prejudice under *Doggett*. *See* discussion, *supra* pp. 21-23. As noted, in deciding a Sixth Amendment claim, courts conduct a balancing test weighing four primary factors. *Doggett,* 505 U.S. at 651 ("whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."); *see also United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003) (citing *Barker*, 407 U.S. at 530-32). Here, all four factors weigh heavily against Defendant.

Assuming the Court sets a trial consistent with the government's proposal, April 5, 2027, Defendant will have 18 months to prepare after the filing of the NOI, consistent with a 28 month average he acknowledges in his own brief, especially given the time he has had to prepare for the guilt phase. Dkt. 99 at 48 n. 32 (*citing to Constanza-Galdomez*, 787 F. Supp.3d at 143); *see also Merrell*, 2025 WL

2911170, at *2 (noting an exhibit that reflected a 28-month average from NOI to trial.).

Any alleged delay to this point owes entirely to Defendant, who sought five trial continuances and two additional extensions of time. *See United States v. Ogiekpolor*, 122 F.4th at 1306 (holding the government does not bear responsibility for a defendant's requests for additional time); *Louis*, 146 F.4th at 1338. No evidence suggests that the government acted in bad faith or deliberately delayed the proceeding. *Cf. Id.* at 1337 ("Deliberate attempts to confound the defense are weighted heavily against the government.") (citing *Barker*, 407 U.S. at 531). In fact, Defendant raised no concern about his speedy trial rights before the filing of the NOI. *United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994) (holding that failure to challenge a supposed delay undercuts a speedy trial claim). Rather, he consistently waived his speedy trial rights.

Because the first three factors weigh against him, Defendant cannot succeed in a speedy trial claim absent a showing of actual prejudice. *Dunn*, 345 F.3d at 1296. As noted, he cannot do so. *See* discussion, *supra* Part III.B. pp 12-23. Defendant has not shown evidence of oppressive pretrial incarceration, of an impairment to his defense, or of undue anxiety for want of a trial. *United States v. Villarreal*, 613 F.3d 1344, 1355 (11th Cir. 2010) (*citing to Barker*, 407 U.S. at 532.). Moreover, he does not cite any authority for his dubious proposition that he might retroactively revoke

his speedy trial waivers because he sought continuances in reliance on the government's initial death penalty decision. *Cf. Constanza-Galdomez,* 787 F. Supp. 3d at 148 n.5 (declining "to make grand constitutional pronouncements"); *Spurlock,* at 1024–25 (noting a prior speedy trial ruling in favor of the government that "made clear that [the court would] take seriously any further burdens to Spurlock's Sixth Amendment rights"). In any event, Defendant fails to credibly suggest he would not have sought continuances if faced with the death penalty. He cannot do so in a motion that, as discussed, asserts a 28-month average between the filing of an NOI and trial.

For two years, Defendant delayed trial. Even now, he opposes the government's proposed date of April 5, 2027, as too soon. Dkt. 96 at 12. His arguments for delays in the past and future undermine any effort to show prejudice stemming from any of the continuances and wholly subvert his effort to make out a speedy trial claim.

### E. The government maintained its authority to seek the death penalty despite its initial announcement that it would not.

Defendant argues that the filing of the government's no-seek notice "affirmatively" and "irretrievably" waived its right to seek the death penalty under the FDPA. Dkt. 99 at 50. Defendant misapprehends the reach of the waiver doctrine.

Waiver, "the intentional relinquishment or abandonment of a known right" (*United States v. Olano*, 507 U.S. 725, 733 (1993)), applies equally to defendants and the government. *See United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023); *see United States v. Levy*, 391 F.3d 1327, 1335 (11th Cir. 2004). Not every right is waivable or waivable in the same way. *See Olano,* 507 U.S. at 733 (holding, "Whether a particular right is waivable . . . whether certain procedures are required . . . depend[s] on the right"); *New York v. Hill*, 528 U.S. 110, 114 (2000) (same).

As explained, the Executive Branch ordinarily remains free to seek additional charges until trial, and Defendant fails to demonstrate how it could unilaterally abandon that authority. *Cf. Peoples*, 360 F.3d at 896 (recognizing the government's authority to pursue the death penalty on a retrial after abandoning the effort in the initial proceeding). Accordingly, the government's notice that it would not pursue capital punishment— unsupported by any consideration and provided for the convenience of the court and counsel—did not expressly or impliedly waive the authority to reverse course. *Cf. United States v. Sosa*, 782 F.3d 630, 637 (11th Cir. 2015) (holding that material promises underlying a plea agreement bind the government); *United States v. Symington*, 781 F.3d 1308, 1313 (11th Cir. 2015) (holding courts may order specific performance of plea bargains).

The government, under the FDPA, can and did file an NOI a reasonable time before trial. The statute does not dictate, much less attach significance to, affirmative declinations of the death penalty. In fact, the FDPA does not even vest an NOI with any durability, and the government regularly withdraws them. *See, e.g.*, United States' Withdrawal of Notice to Seek the Death Penalty and Notice of Intent Not to Seek the Death Penalty, *United States v. Paul*, No. 6:96cr60022 (E.D. Ark. Oct. 10, 2023) ECF No. 458; Government's Withdrawal of Intent to Seek the Death Penalty, *United States v. Rodriguez-Mendoza*, No. 4:10cr459 (S.D. Tex. Nov. 6, 2023), ECF No. 788. Consistent with that practice, the government extends to criminal defendants the ability to request withdrawal of an NOI. *See* J.M. § 9-10.160(B). Understood against that background of law and practice, the government's announcement that it would not pursue capital punishment did not waive its authority to change course. Given the executive's "absolute discretion to decide whether to prosecute a case," *Nixon*, 418 U.S. at 693, this Court should not presume that the Department of Justice would, by implication alone, abandon its power to reassess its approach.

Defendant fails to bolster his position through his reliance on *United States v. Waggoner*, 339 F.3d at 918. As noted, that case involves a presumption, but not a judicial finding, of irrevocability. For much the same reason, Defendant also fails in relying on *Suarez,* 801 F. Supp. 3d at 875. That opinion concerns an uncontested

defense motion to terminate the appointment of learned counsel, not the revocability of death penalty decisions, and has no precedential value to the question at hand. *See Webster*, 266 U.S. at 511. For want of meaningful authority, Defendant cannot demonstrate that the government ever waived its authority to seek the death penalty.

**F. The government is not estopped from seeking the death penalty under any theory of estoppel.**

Defendant asserts that the doctrines of judicial, equitable, and promissory estoppel prevented the government from validly filing its NOI. Dkt. 52 at 52. Defendant's claims are misplaced. Estoppel is inapplicable to the government's conduct, because it was acting in its sovereign capacity. Even if the estoppel doctrine can be applied, it lacks factual support here, as Defendant has not identified any proof of "affirmative misconduct" by the government or efforts by it to "obtain an unfair advantage" or "to make a mockery of the judicial system." *See New Hampshire v. Maine*, 532 U.S. 742, 750-51, (2001); *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017); *Tovar-Alvarez v. U.S. Atty. Gen.*, 427 F.3d 1350, 1354 (11th Cir. 2005).

*i. Judicial Estoppel*

Judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a position it took in a previous proceeding. *New Hampshire v. Maine*, 532 U.S. at 749; *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285

(11th Cir. 2002), *overruled on other grounds by Slater v. United States Steel Corp.*, 871 F.3d at 1185. When evaluating an estoppel claim, courts typically consider: (i) whether the present position is clearly inconsistent with the earlier one; (ii) whether the party persuaded a tribunal to accept the earlier position; and (iii) whether the party advancing the inconsistent position would derive an unfair advantage. *New Hampshire*, 532 U.S. at 750-51. A court may also apply estoppel when a plaintiff (i) took a position under oath that was inconsistent in a separate proceeding; and (ii) intended to make a mockery of the judicial system. *Slater v. United States Steel Corp.*, 871 F.3d at 1180; *Burnes v. Pemco Aeroplex*, *Inc.,* 291 1285–86.

The estoppel doctrine does not apply to the government as it does to other litigants. *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60 (1984) (holding that the obedience to the law suffers if the conduct of government agents estops it from enforcement). Estoppel may not be asserted against the United States when it acts in its sovereign capacity:

> [F]or estoppel to apply against the government (1) the traditional elements of estoppel must have been present; (2) the government must have been acting in its proprietary capacity as opposed to its sovereign capacity; and (3) the government's agent must have been acting within the scope of his or her authority.

*United States v. Killough*, 848 F.2d 1523, 1526 (11th Cir. 1988); *see Cox v. Kurt's Marine Diesel of Tampa, Inc.,* 785 F.2d 935, 936 (11th Cir. 1986).

A criminal prosecution, like that underlying this action, falls within the government's sovereign capacity. *See Borowski v. Kean Univ.*, 68 F.4th 844, 851 (3d Cir. 2023) (holding enforcement of criminal laws constitutes an exercise of "sovereign police power"); *United States v. Singleton*, 165 F.3d 1297, 1300 (10th Cir. 1999) (noting the government's sovereign authority to prosecute). As such Defendant's claim of judicial estoppel cannot lie, and the Court should reject the argument on that ground.

Even if the doctrine applied to the government, it would not be estopped here. The government announced its alternate death penalty positions in a single proceeding. It made no effort to persuade any court of the rectitude of its decision not to pursue the death penalty, nor did it offer it under oath. Moreover, the government's reevaluation of its decision was not designed to "obtain an unfair advantage" or "to make a mockery of the judicial system." *Slater v. United States Steel Corp.*, 871 F.3d at 1180. In fact, the government's decision stemmed from a broad and case-neutral reemphasis of the death penalty by a new political administration. The decision did not undermine the Court's authority or provide the prosecution with any unfair advantage. *New Hampshire v. Maine*, 532 U.S. at 751.

Defendant misplaces his reliance on *Constanza-Galdomez*, 787 F. Supp. 3d at 147-78, and *Spurlock*, 782 F. Supp. 3d 987 at 1011-14, neither of which contemplate the limitations of the estoppel doctrine on the government when it is acting as a

sovereign. Because the government's actions did not make a mockery of the judiciary, mislead the court, or result in an unfair advantage over Defendant, the claim of judicial estoppel fails.

*ii. Equitable Estoppel*

As with Defendant's claim of judicial estoppel, his assertion of equitable estoppel also fails. Dkt. 99 at 54. A party asserting equitable estoppel must establish (i) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (ii) willfulness or negligence with regard to the acts, conduct or acquiescence; and (iii) detrimental reliance by the other party. *Tefel v. Reno*, 180 F.3d 1286, 1302 (11th Cir. 1999).

To establish such a claim against the government, a party must prove "affirmative misconduct" by the government. *Tovar-Alvarez*, 427 F.3d at 1350, (11th Cir. 2005). Affirmative misconduct requires more than "negligence" or "inaction." *United States v. McCorkle*, 321 F.3d 1292, 1297 (11th Cir. 2003); *see also Savoury v. U.S. Atty. Gen.*, 449 F.3d 1307, 1319 (11th Cir. 2006) (noting "if the government may be estopped . . . it would take more of a showing than when the doctrine is applied against a private litigant.")

Here, no evidence exists of governmental willfulness, negligence or misconduct. The government openly undertook efforts to reach a death penalty

decision consistent with the facts of the case and the guidance of its political leaders. It has not engaged in secret machinations or acted negligently in any way.

Defendant nonetheless insists he has no burden to establish the government acted fraudulently, citing two distinguishable Fourth Circuit cases focused on contractual disputes in which the government was a nominal plaintiff. Dkt. 99 at 54. *See U. S. for Use & Benefit of Humble Oil & Ref. Co. v. Fid. & Cas. Co. of New York*, 402 F.2d 893, 898 (4th Cir. 1968) ("To establish equitable estoppel it is not necessary that actual fraud be shown. It is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice") (citing *U.S. for Use & Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938)). Even if those opinions had some relevance to this dispute, the Fourth Circuit required a showing that the "person estopped … misled another to his prejudice." *Humble Oil*, 402 F.2d at 898.

The government never misled Defendant. Under prior leadership, it informed him of a sincere intent not to pursue capital punishment. When political circumstances, and attendant enforcement priorities changed, it informed him it would reconsider the decision and did so. At no point has it referred to its decisions as irrevocable, though Defendant may have chosen to believe otherwise.

Defendant also relies on an admonition in the Justice Manual to promptly inform the court and counsel of a "final decision" on the death penalty as somehow

imparting an expectation of permanence. *See* J.M. § 9-10.150. Once again, the Manual, by its own terms, does not create actionable rights Defendant may enforce. In any event, Defendant reads the term "final" out of context, as the relevant provision uses the adjective to refer to the *last* decision in a lengthy process, not to create an expectation of irrevocability. To read it as Defendant does would render the manual's immediately successive provision, concerning the withdrawal of NOIs, a dead letter. *Cf.* J.M. § 9-10.160.

For want of any showing of governmental misconduct, Defendant should fail in his equitable estoppel claim.

*iii. Promissory Estoppel*

Defendant also fails in attempting to assert the doctrine of promissory estoppel against the government. Dkt. 99 at 56. The doctrine provides that, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90 (1979). Such estoppel requires a "clear and definite promise" (*see, e.g.*, *Expo Props., LLC v. Experient, Inc.*, 956 F.3d 217, 225 n.6 (4th Cir. 2020)) and proof of "affirmative misconduct." *See United States v. Vanhorn*, 20 F.3d 104, 112 n.19 (4th Cir. 1994) (holding "estoppel is rarely, if ever, a valid defense against the Government absent proof of some affirmative

misconduct"). Courts enforce promissory estoppel against the government in the context of contract law, not when assessing statements of position or status. *See, e.g., United States v. Chiu*, 109 F.3d 624 (9th Cir. 1997) (proffer agreement); *United States v. Weave*r, 905 F.2d 1466 (11th Cir. 1990) (immunity agreement).

Here, the government never promised it would not reconsider its decision not to pursue the death penalty. In its initial notice, the government provided a statement of its existing intentions, not a contractually enforceable guarantee against a subsequent change of plans. The government reached its decision without input from Defendant, much less some bargain with him. For want of any unambiguous promise, Defendant could not have reasonably relied to his detriment. Even if the notice somehow amounted to a promise against a change of direction, Defendant has plainly failed to identify any "affirmative misconduct" on which to perfect his claim of promissory estoppel. As such, the claim should fail.

### G. The NOI is Consistent with Fifth and Eighth Amendment Principles.

Defendant argues the NOI violates the Fifth and Eighth Amendments. Dkt. 99 at 58, 60. His arguments, considered in series below, all lack merit.

*i. Due Process*

Defendant argues the government presented its initial decision not to pursue the death penalty as absolute, final, and unconditional. Dkt. 99 at 58. By extension, he asserts the reversal of the allegedly irrevocable notice violated his Fifth

Amendment due process rights. *Id.* As explained above, the initial notice did not promise Defendant anything or provide him with an enforceable guarantee against a different decision, an action consistent with the government's broad discretion in the charging arena.

Defendant fails to identify any authority for the notion that the government violates the Due Process Clause when it represents, without a formal agreement, it will not bring certain charges but subsequently alters course. He relies instead on the opinion in *Spurlock*, which found a due process violation based on the government's dilatory NOI filing (12 days before trial), not because it had demonstrably bound itself to its initial decision. *See* 782 F. Supp. 3d at 1024 (holding "a continuance to allow the government to proceed with a capital trial would be significant in length, and most importantly, [sic result] in extreme degree of prejudice"). Defendant's alternate authority, *Dangleben*, 2025 WL at *7, n.8, reaches ostensibly the same conclusion, finding a late NOI violated procedural due process, not an expectation that initial decision to forgo capital punishment would remain unchanged.

Defendant also cites to *Commonwealth v. Cosby*, 666 Pa. 416, 495–96 (2021). There, the defendant "relied to his detriment upon the district attorney's decision not to prosecute him" and incriminated himself. *Id.* at 496. A prosecutor's blatant perfidy, designed to encourage the surrender of constitutional rights bears no

resemblance to the circumstances at hand, in which the government extracted nothing from Defendant via its initial decision not to pursue the death penalty.

Defendant separately argues the government's conduct was "arbitrary and capricious" and "shocks the conscience." Dkt. 99 at 58. The choice to file the NOI, like any decision to enhance the basis of an ongoing pre-trial prosecution, was neither arbitrary nor capricious. *See Armstrong* at 464 ("So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.") (*citing to Bordenkircher v. Hayes*, 434 U.S. 357, 364, (1978). Indeed, Defendant participated in the lengthy decision-making process, as set forth in the Justice Manual provisions he now seeks to utilize for his own benefit. The government's reliance on its decision-making protocol ensured individualized consideration of the appropriate factors in this case.

Except in limited areas, the prosecutor's charging discretion is ill-suited to review. *See Wayte v. United States*, 470 U.S. 598, 607–08. A "decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Id*. at 608 (internal citations and quotation marks omitted). Here, nothing submitted by Defendant even suggests the NOI reflects a

discriminatory motive, invidious classification or improper motivation. Absent such a showing, his complaints do not warrant judicial interdiction.

Defendant also asserts that the filing of an NOI after 951 days shocked the conscience. In support of this theory, Defendant relies on an opinion that finds executive conduct that amounts to an abuse of power or the employment of oppressive instruments is "fatally arbitrary in the constitutional sense." *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999). To satisfy that standard, intentional conduct is insufficient unless "intended to injure in some way unjustifiable by any government interest." *Id.*

The government's conduct here does not come close to the standard of constitutional arbitrariness. The government changed its decision to seek the death penalty in a murder case in which it could otherwise pursue a life sentence. It did not announce the pursuit of capital punishment by a person accused of a petty crime. There was no abuse of power or deliberate and unjustifiable effort to oppress the defendant. The government simply recalibrated its view on the maximum punishment it would seek for a man who had already been accused of kidnapping and homicide of his child's mother. Defendant's conduct placed the government in the position of choosing between the pursuit of the two most drastic punishments permitted against an individual. The legal consequences of Defendant's crimes may

be sobering, but they are legally just, and the need to choose amongst them is a consequence of his behavior not some unforeseeable or unfair abuse of power.

Nonetheless, Defendant argues the government's delay in seeking the death penalty prejudiced his ability to prepare for sentencing. Dkt. 99 at 59. He fails to state a cognizable claim. As discussed above, Defendant can remedy his need to prepare for trial through a continuance. The government has proposed an April 2027 trial date. Nothing prevents Defendant from requesting a longer trial setting if he believes such time would aid him in preparing his defense.

For the above reasons, Defendant's Fifth Amendment due process arguments fail.

*ii. Cruel and unusual punishment*

Defendant argues that the NOI is "cruel (indeed, inhumane)" and "certainly unusual," in that it inflicts trauma in supposed violation of the Eighth Amendment. Dkt. 99 at 60. Defendant should fail in his effort to apply the Eighth Amendment in this procedural setting.

Defendant offers no legal authority for the proposition that facing the possibility of the death penalty, following a prior no-seek notice, constitutes punishment in the constitutional sense, much less a variety that would offend the Eighth Amendment. "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth

Amendment." *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (internal citations and quotations omitted). To be cruel and unusual, conduct that does not purport to be punishment must involve more than ordinary lack of due care for a prisoner's interests or safety. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Nothing of the sort has occurred here.

Having asserted an Eighth Amendment violation to a pre-trial procedural step, Defendant attempts to rely on a Second Circuit decision that cites the protections of an entirely different constitutional provision, the Sixth Amendment. *Black*, 918 F.3d at 257 ("The Supreme Court again made it clear that when a defendant is arrested, a criminal prosecution has begun, and a defendant's speedy trial right attaches."). Patently, that opinion does not assist him.

His remaining authority likewise fails to provide a legal basis for his assertion that the Eighth Amendment exists as a bulwark against any psychological harm. *Cf., e.g., Watison v. Carter*, 668 F.3d 1108 (9th Cir. 2012). To be sure, the cited cases support the intuitive notion that jailers may not wantonly abuse prisoners, but they do not come close to suggesting that a prosecutor's decision to seek the maximum allowable punishment against a defendant provides a basis for an Eighth Amendment claim. Although Defendant has not yet been convicted or sentenced, any delay occasioned by the filing of the NOI in awaiting a possible execution would also not amount to cruel and unusual punishment under the Eighth Amendment. *McKenzie v.*

*Day*, 57 F.3d 1461, 1466-67 (9th Cir. 1995) ("We cannot conclude that delays caused by satisfying the Eighth Amendment themselves violate it.").

Because Defendant has not suffered any harm cognizable by the Eighth Amendment, this Court should reject his claim of cruel and unusual punishment.

## IV. CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges the Court to deny Defendant's Motion to strike the NOI.

Respectfully submitted on January 26, 2026.

PRIM F. ESCALONA
United States Attorney
Northern District of Alabama

/s/ *Walter Perkel*
WALTER PERKEL
Trial Attorney, DOJ Criminal Division
DANIEL S. MCBRAYER
J. ALAN BATY
BRITTNEY L. PLYLER
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record in this case.

/s/ *Walter Perkel*
WALTER PERKEL
Trial Attorney, DOJ Criminal Division