FILED
2026 Jul-02 PM 12:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 4:23-cr-00021-CLM-SGC** |
| | § | |
| **MARCUS SPANEVELO** | § | |
| | § | |

**DEFENDANT'S POST-HEARING SUPPLEMENTAL BRIEF**

Marcus Spanevelo submits this post-hearing brief in response to this Court's order of June 23, 2026 (ECF No. 136). In that order, this Court set forth five questions for the parties to address. Each are addressed below.

**1. Analogous Situations Where the Government Has Not Been Permitted to Change Its Position When a Defendant Has Detrimentally Relied on the Government's Original Position**

This Court first asked the parties to address whether there are any "other analogies in the criminal context" where the government has initially asserted one position and subsequently attempted to change that position – such as the government's change in its original position not to file a § 851 information authorizing a sentence enhancement in a drug-trafficking case. Counsel have not found any case in which the government gave notice that it would not file a § 851

enhancement but subsequently sought to change its position over the defendant's objection.[1]

In several other contexts, however, courts have held that the prosecution was estopped from changing its position during criminal litigation when the defendant *detrimentally relied* on the prosecution's original position.[2] The common feature in

---

[1] Even if such a case existed, it is difficult to see how it would be analogous to Mr. Spanevelo's case. Pursuant to 21 U.S.C § 851, the prosecution must give pre-conviction notice (in the form of an "information") of a prior predicate conviction that would require an enhancement of the defendant's statutory range of punishment under 21 U.S.C § 841(b). Unlike a death penalty case – where mitigating evidence is critically important in defending against the prosecution's efforts to obtain a death sentence – there is no equivalent mitigation in defense of a § 841(b) enhancement. Therefore, it is difficult to see how a defendant could be prejudiced (or detrimentally rely) on the prosecution's change of position about filing a § 851enhancement. Conversely, Mr. Spanevelo detrimentally relied on the prosecution's no-seek notice by failing to prepare his defense for a death penalty trial for over two years.

[2] *See United States v. Gamboa-Cardenas*, 508 F.3d 491, 503-04 (9th Cir. 2007) (holding that the government's original pretrial representation to the defendant that he was legally eligible for the "safety valve" under 18 U.S.C. § 3553(f) – which caused the defendant to "debrief" with the government before trial and thereafter *not testify* at trial (which would have jeopardized his ability to receive the benefit of the safety valve if he was convicted) – estopped the government at sentencing from asserting that the defendant was legally ineligible for the safety valve); *United States v. Taylor*, 71 F. Supp.2d 420, 424-25 (D. N.J. 1999) (holding that the government's original pretrial representation that the government would not offer the defendant's confession during the government's case-in-chief (and would only use it to impeach the defendant if he testified) – which caused the defendant not to file a pretrial motion to suppress his confession – prevented the government from using the confession in its case-in-chief); *State v. Troyer*, 910 P.2d 1182, 1194-95 (Utah 1995) (holding that the prosecutor's original pretrial representation that the prosecution would not call inmates from the defendant's pretrial detention facility to testify against the defendant at trial – which caused the defendant not to request transfer to a different pretrial detention facility – prevented the prosecution from calling other

all of these cases is that the defendant had "detrimentally relied" on the prosecution's original position and, if the court permitted the prosecution to change its position, it would have prejudiced the defendant. *Gamboa-Cardenas*, 508 F.3d at 504; *Taylor*, 71 F. Supp.2d at 425; *Troyer*, 910 P.2d at 1195; *Wilson*, 606 A.2d at 1023. Because, as Mr. Spanevelo has proved, he and his defense counsel detrimentally relied on the government's original no-seek notice for over two full years, the government should not be permitted to seek the death penalty.[3]

**2. *Hunter v. United States***

---

inmates as witnesses against the defendant); *Wilson v. United States*, 606 A.2d 1017, 1022-27 (D.C. 1992) (holding that the prosecutor's original pretrial representation that the prosecution would not offer any prior convictions to impeach the defendant if he elected to testify at trial – which caused the defendant to engage in a different voir dire strategy than he would have if he had known his prior convictions would be introduced at trial and also caused him to turn down a plea offer – estopped the prosecutor from offering the defendant's prior convictions at trial), *overruled on other grounds by Lyons v. United States*, 683 A.2d 1066, 1067 (D.C. 1996).

[3] Also relevant to consider is the scenario when *a defendant* originally preemptively informed the prosecution that the defendant was *not* going to raise an affirmative defense like alibi or insanity – which requires timely pretrial notice,[3] just like 18 U.S.C. § 3593(a) does concerning the government's notice of intent to seek the death penalty. Assume thereafter, when substantial time had passed, the defendant seeks to change his mind and raise such a defense. In the meantime, the prosecution lost an important witness who could have helped rebut the defendant's affirmative defense. Accepting the government's position in Mr. Spanevelo's case about its supposed unfettered ability to change its position about seeking the death penalty would – in fairness – permit a defendant in the above scenario to change his position in the same manner (regardless of whether it prejudiced the prosecution).

This Court has asked (1) whether Mr. Spanevelo's reliance on *Hunter v. United States*, 608 U.S. ___, 2026 WL 1751815 (June 18, 2026), raises a "new theory" (different from the ones raised in his motion to strike); and, if so, (2)(a) what "court authority" *Hunter* invoked for its procedural rule and (b) why permitting the government to seek the death penalty under the circumstances of Mr. Spanevelo's case would "bring the judicial system into disrepute" (language used in *Hunter*).

Mr. Spanevelo has not cited *Hunter* for the purpose of raising a "new theory." He primarily has cited *Hunter* in support of his waiver and estoppel arguments. The Court in *Hunter* held that the government, under "ordinary litigation principles," did *not* "waive" its ability to enforce the appellate waiver in Hunter's plea agreement because the government merely was "silent" in response to the district court's erroneous statement that Hunter had retained his right to appeal despite the appellate waiver in the agreement. *Hunter*, 2026 WL 1751815, at *6. The government's silence in *Hunter* stands in stark contrast to the government's affirmative conduct in Mr. Spanevelo's case. Under "ordinary litigation principles," the government's no-seek notice was "an affirmative signal of abandonment" of its right to seek the death penalty. *Hunter*, 2026 WL 1751815, at *6. Therefore, the government has waived its ability to seek the death penalty.

The second aspect of the *Hunter* decision on which Mr. Spanevelo relies is the Court's discussion of why a "miscarriage of justice" exception is appropriate in

cases in which a criminal defendant waived his right to appeal in a plea agreement. *Hunter*, 2026 WL 1751815, at *7. The Court believed such an exception is required because of "the special, and indeed, pivotal role of the judiciary in approving and implementing appeal waivers" in plea agreements. *Id.*

Similarly, under well-established Judicial Conference policy, district courts have a "special and, indeed, pivotal" role in connection with the government's decision whether to seek the death penalty in two ways: (1) district courts are obligated to appoint "learned" counsel under 18 U.S.C. § 3005 and a mitigation specialist (and other capital experts) under 18 U.S.C. § § 3599 at the "outset" of a potentially capital case (i.e., when charges are filed that potentially carry the death penalty and in some cases even before capital charges are filed);[4] and (2) district

---

[4] *See Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Counsel*, at page 21 of the 39-page primary report (May 1998), https://www.uscourts.gov/file/originalspencerreportpdf. That report was adopted in 1998 by the Judicial Conference. *See Guide to Judiciary Policy*, Vol. 7, Defender Services, Part A, *Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, § 610.20 (Judicial Conference Recommendations). A supplemental 2010 report stated:

> Courts should not wait to see whether the government will seek capital prosecution before appointing appropriately qualified counsel and granting them the resources necessary for a preliminary investigation. The goals of efficiency and quality of representation are achieved by early appointment of learned counsel in cases where capital indictment may be sought.

courts should set a deadline for the government to announce (one way or the other) whether it will be seeking the death penalty.[5]

The latter portion of the *Hunter* decision is thus relevant for two additional reasons. First, it supports Mr. Spanevelo's judicial estoppel argument. The Court in *Hunter* expressed concern that enforcing an appellate waiver in some cases could have a negative effect on the judiciary and adopted the miscarriage-of-justice exception for that reason. Similarly, when a district court has relied on the government's no-seek notice in a capital case – by (1) not scheduling a deadline for giving notice of intent to seek the death penalty under 18 U.S.C. § 3593 and (2) not appointing a learned counsel and a mitigation specialist – the government should not be permitted to change its position, at least where the defense had been prejudiced during the no-seek period. Second, *Hunter* supports Mr. Spanevelo's alternative,

---

Appx. 6A: Recommendations & Commentary Concerning the Cost and Quality of Defense Representation (*Updated Spencer Report*, September 2010), at 93, https://www.uscourts.gov/file/vol07a-ch06-appx6apdf.

[5] *See Guide to Judiciary Policy*, Vol. 7, Pt. A, Ch. 6, § 670(a) ("[T]he court should establish a schedule for resolution of whether the government will seek the death penalty."). The Department of Justice helped draft § 670(a). *See United States v. McGill*, No. 09-cr-2856, 2010 WL 1571200, at *3 (S.D. Cal. Apr. 16, 2010). Furthermore, Section 9-10.150 of the *Justice Manual* expressly recognizes that: "Expeditious communication is necessary so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required." *Id.* (emphasis added).

fallback position that this Court should prohibit the government from seeking the death penalty under this Court's "supervisory authority."[6]

With respect to this Court's question of whether permitting the government to seek the death penalty after it filed a no-seek notice 951 days beforehand would "bring the judicial system into disrepute," Mr. Spanevelo contends that it would do so. *See Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020) ("Justice Holmes famously wrote that '[m]en must turn square corners when they deal with the Government.' ... But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'") (citations omitted); *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)

---

[6] *See* Motion to Strike the Government's Notice of Its intent to Seek the Death Penalty (ECF No. 99), at 6-7 n.5, 18 n.15 & 46 n.31. Mr. Spanevelo is unable to answer this Court's question about what "court authority does [the Supreme Court in] *Hunter* invoke" in discussing the independent interest of the judiciary in its "miscarriage of justice" exception. It is not clear from the majority opinion what authority the Court invoked. According to Justice Barrett, who joined the majority opinion and concurred separately in a single-justice opinion, it was not the Court's "supervisory authority" and, instead, was more appropriately viewed as an exercise of "procedural common law." *Hunter*, 2026 WL 1751815, at *16 (Barrett, J., concurring); *see also id.* at *17 (Thomas, J., dissenting) (contending that the majority's ruling was not based on a "supposed 'supervisory power'"). Regardless, whether as an exercise of this Court's supervisory authority or as a matter of federal procedural common law, this Court should prevent the government from seeking the death penalty under the circumstances of this case.

("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government").[7]

Finally, concerning his waiver argument, Mr. Spanevelo points out that, in enacting the Federal Death Penalty Act, Congress clearly was aware of the common-law waiver doctrine when it statutorily required the government to give notice of its intent to seek the death penalty in order lawfully to seek it. *See Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021) (noting that "Congress legislate[s]

[7] It is noteworthy that the *Hunter* Court's references to an error (if left uncorrected) as being one "that would bring the judicial system into disrepute" and "undermine public confidence in the judiciary" strongly indicate that such an error is the same type that would warrant reversal under the fourth prong of the "plain error" standard. *See United States v. Olano*, 507 U.S. 725, 734, 736 (1993) (stating that plain errors warrant correction if they "seriously affect the fairness, integrity *or public reputation of judicial proceedings*") (emphasis added); *id.* at 736 ("We previously have explained that the discretion conferred by [Federal Rule of Criminal Procedure] 52(b) should be employed in those circumstances *in which a miscarriage of justice would otherwise result.*") (citations and internal quotation marks omitted; emphasis added)); *see also United States v. Gonzalez-Huerta*, 403 F.3d 727, 736-40 (10th Cir. 2005) (en banc) (affirming sentence for failure to satisfy fourth prong of the *Olano* standard because the error was not a "particularly egregious" type "that would result in miscarriage of justice or otherwise call the judiciary into disrepute").

However, Mr. Spanevelo is not contending that, in order to strike the government's notice of intent to seek the death penalty, this Court must conclude that permitting the government to seek the death penalty would qualify as a "miscarriage of justice" within the meaning of *Olano* and *Hunter*. Instead, regarding his **estoppel** arguments, he contends that this Court need only find that he has *relied to his detriment* on the government's no-seek notice. And regarding his separate **waiver** argument, he points out that he need not even show any detrimental reliance or prejudice in order to prevail. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (noting "a federal court assessing waiver does not generally ask about prejudice").

against a background of common-law adjudicatory principles and it expect[s] those principles to apply except when a statutory purpose to the contrary is evident") (citation and internal quotation marks omitted). Therefore, it is proper to assume that Congress envisioned that the government could affirmatively waive its statutory authority to seek the death penalty. *Clement v. U.S. Atty. Gen.*, 75 F.4th 1193, 1201 (11th Cir. 2023) ("Statutory rights are presumptively subject to waiver and forfeiture.") (*citing United States v. Mezzanatto*, 513 U.S. 196, 200-01 (1995), and *Stern v. Marshall*, 564 U.S. 462, 480-82 (2011)).

**3. Judicial Estoppel's Application to a Party's Change of Position in a Single Proceeding**

This Court asked whether judicial estoppel applies to a party's change of position in a single proceeding as opposed to a party's inconsistent positions taken in two different proceedings. The Supreme Court repeatedly has stated that judicial estoppel can apply in either successive litigations *or* different "phases" of the *same litigation*. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) (same); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011) (suggesting that a party's change in its legal position in the same case was barred by judicial estoppel); *Zedner v. United States*, 547 U.S. 489, 503-06 (2006) (considering application of judicial estoppel doctrine to criminal defendant's conduct in prior phase of the same case with respect to defendant's

position in subsequent phase of the same case, yet ultimately concluding that the government had failed to prove the three elements of judicial estoppel).

Although the Eleventh Circuit in the bankruptcy context has stated that judicial estoppel applies when a party has taken an inconsistent position in a "separate [i.e., prior] proceeding," *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017) (en banc), *Slater* necessarily concerned two separate proceedings: a prior civil lawsuit and a subsequent bankruptcy proceeding – where the party who filed the bankruptcy action failed to disclose his prior civil lawsuit. *Slater* thus had no reason to address judicial estoppel as applied to a party's diametrically opposed positions taken in the same proceeding. Significantly, after *Slater*, the Eleventh Circuit applied judicial estoppel to a party based on its inconsistent positions taken in the same case. *See Compulife Software Inc.*, *v. Zurich American Ins. Co.*, No. 22-12909, 2024 WL 3618439, at *2-*3 (11th Cir. Aug. 11, 2024) (unpublished).[8]

---

[8] In *Compulife Software Inc.*, the plaintiff initially contended (and proved) that the defendant engaged in an intentional tort. After obtaining a judgment, the plaintiff moved for a writ of garnishment against the defendant's insurance company. When the plaintiff discovered that the defendant's insurance policy did not cover intentional torts, the plaintiff sought to change its position and argue that the defendant only acted negligently. The Eleventh Circuit applied the judicial estoppel doctrine to prevent the plaintiff from making the latter argument. *See Compulife Software Inc.*, 2024 WL 3618439, at *2-*3. The plaintiff's inconsistent positions occurred in the same proceeding (District Court No. 9:16-cv-81942-BER).

There is no logical basis to limit judicial estoppel's application solely to a party's inconsistent position taken in a prior proceeding but not apply the doctrine to a prior inconsistent position in the same proceeding (where the opposing party relied to their detriment on the first party's initial position). As the Supreme Court recently recognized, judicial estoppel "eschews mechanical rules," "depends on flexibility," and should be applied on a "case-by-case basis." *Keathley v. Buddy Ayers Construction, Inc.*, 608 U.S. __, 2026 WL 1686028, at *5 (June 11, 2026) (citations and internal quotation marks omitted). As another judge of this Court has noted that:

> … [T]he Eleventh Circuit typically applies judicial estoppel when contrary representations are made in separate judicial proceedings that involve bankruptcy. But the underlying reasoning upon which the Eleventh Circuit relies is that "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Slater*, 871 F.3d at 1181 …. And, the Eleventh Circuit has not prohibited the application of judicial estoppel to a scenario in which parties seek to gain an advantage in the same litigation, such as is the case before the Court.

*Coleman v. Morris-Shea Bridge Co., Inc.*, 2:18-cv-00248-LSC, 2021 WL 4409088, at *8 n.2 (N.D. Ala. Sept. 27, 2021), *aff'd on other grounds*, Nos. 21-13764 & No. 22-10239, 2026 WL 551909 (11th Cir. Feb. 27, 2026). The district court in *Coleman* also noted that several other circuits have applied judicial estoppel to a party's inconsistent positions in the same case. *Coleman*, 2021 WL 4409088, at *8; *see also Intellivision v. Microsoft Corp.*, 484 Fed. Appx. 616, 621 (2d Cir. 2012) ("… [O]ur

Court, like the Supreme Court, has recognized that a prior inconsistent representation made in a prior phase of the same case can trigger judicial estoppel.") (citations omitted).

### 4. Promissory Estoppel's Application to the Government in a Criminal Case

This Court asked whether there are any Supreme Court or Eleventh Circuit cases applying promissory estoppel against the government in a criminal case. In *United States v. Weaver*, 905 F.2d 1466, 1474 (11th Cir. 1990), the defendant contended that the government had offered immunity to the defendant if he cooperated (which he claimed to have done) and that the government should be held to its promise. The Eleventh Circuit rejected the defendant's argument but did not hold that promissory estoppel was invariably inapplicable to the government. Instead, the Eleventh Circuit accepted that, when the defendant proved the elements of promissory estoppel, it did apply against the government:

> The doctrine of estoppel may be invoked to prevent "a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation." RESTATEMENT (SECOND) OF CONTRACTS, § 90 comment a. For the government to be estopped from prosecuting Sikes for crimes committed in 1986, Sikes would have to show that his cooperation after May 14th was as a result of the government's representation that he would not be prosecuted for criminal acts committed in 1986. In this case, Sikes has not presented or proffered any such evidence. Under such circumstances, a person such as Sikes may not prevail upon an alleged existence of an agreement of the type involved in this case based solely on the defendant's subjective impression that a promise had been made; instead, objective standards are utilized. *See* [*United States v.*]

> *Calimano* 576 F.2d [637,] 640 [(5th Cir. 1978)]. *See also United States v. Weiss*, 599 F.2d 730, 736-38 (5th Cir.1979) [footnote 13]. By contrast as to result, but in accordance with the same principles of law, this court, in *Rowe v. Griffin*, 676 F.2d [524,] 528 [11th Cir. 1982)], affirmed the district court's dismissal of an indictment upon a prima facie showing that the government had promised the defendant immunity from prosecution for certain offenses in return for his cooperation and that the defendant had complied in good faith with the terms of the agreement. Applying the rationale employed in *Calimano*, *Weiss*, and *Rowe* to the facts of the instant case, since the government made no promises that Sikes would not be prosecuted for any offenses committed in 1986, the doctrine of promissory estoppel is of no aid herein to Sikes. *See Johnson v. Beto*, 466 F.2d [478,] 480 [(5th Cir. 1972)] (discussing promissory estoppel in a plea agreement setting).

*Id.* at 1473-74; *cf. United States v. Holloway*, 74 F.3d 249 (11th Cir. 1996) (enforcing a federal prosecutor's informal implied promise of immunity where the defendants had relied to their detriment on the promise).[9]

The Eleventh Circuit thus recognizes promissory estoppel can apply against the government in a criminal case if the government made a "representation" or "promise" which resulted in reasonable detrimental reliance by the defendant (even if no mutuality of obligation or consideration is involved). The government's no-

---

[9] In *Holloway*, an Assistant U.S. Attorney who wished to take the Holloways' depositions in a federal civil case told the Holloways' attorney that "we're not going anywhere criminally with this thing . . . this is a civil case." *Holloway*, 74 F.3d at 252. The Holloways relied on that statement by proceeding with the depositions rather than invoking their right to silence. *Id.* After the U.S. Attorney's office later indicted the Holloways, the Holloways argued that they "relied to their detriment" on the AUSA's promise of immunity by proceeding with the civil depositions. *Id.* at 251. The district court accepted that position – treating the AUSA as having made a promise of immunity – and dismissed the indictment. The Eleventh Circuit affirmed. *Id.* at 253.

seek notice was a "promise" (or at the very least was a "representation") on which Mr. Spanevelo and his counsel reasonably relied to Mr. Spanevelo's detriment. *United States v. Dangleben*, 177 F.4th 477, 486 (3d Cir. 2026) ("Common sense, fair play, and basic criminal procedure all require that the court can enforce ***the Government's promise***.") (emphasis added); BLACK'S LAW DICTIONARY (10th ed. 2014) (defining a "promise" as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made").

**5. Mr. Spanevelo's Father's Cause of Death**

Finally, this Court asked for information about the cause of Mr. Spanevelo's father's death. As explained in the attached declaration of Kelly Hart (**Exhibit**), the former mitigation specialist, she learned from family members[10] that he died of a sudden heart attack. Ms. Hart explains that she did not have any information causing

[10] Counsel for Marcus Spanevelo has learned from Ms. Hart that she spoke with Roberto Spanevelo's sister about his cause of death. When we learned this, we first realized that this person was Marcus Spanevelo's paternal aunt as opposed to his maternal aunt. We previously had been under the mistaken impression that Mr. Spanevelo only had maternal aunts still living. We therefore correct our prior misstatement that no members of Mr. Spanevelo's paternal side of the family are living after his father's death. Despite the surviving paternal aunt, Roberto Spanevelo's death is still highly prejudicial as a loss of a potential key mitigation witness or, at the very least, loss of a valuable source of information about Marcus Spanevelo's childhood and his paternal family history. As Ms. Hart's declaration shows, Roberto's sister does not appear to be a meaningful source of mitigating information about either topic.

her to believe that the father was in poor or declining health when she traveled to Brazil in mid-2025 and that news of his death in October 2025 was a complete surprise to her. Also noted in Ms. Hart's declaration is an important fact that also explains why she was unable to return to Brazil and seek to interview Roberto Spanevelo – the federal government "shut down" during mid-2025.

**CONCLUSION**

For the foregoing reasons and for the reasons set forth in Mr. Spanevelo's prior submissions, this Court should strike the government's notice of its intent to seek the death penalty.

Respectfully submitted,

/s/ *Jeffrey Ertel*

Jeffrey Ertel
The Mendelsohn Ertel Law Group
101 Marietta Street, NW., Ste 3325
Suite 3325
Atlanta, GA 30303
404-885-8878
Email: jeffrey@tmelg.com

Lisa Marie Ivey
Stubbs Sills & Frye, PC
1724 South Quintard Avenue
PO Box 2023
Anniston, AL 36202-2023
256-835-5050
Fax: 256-835-0011
Email: lisa@stubbssillsfrye.com

Brent E. Newton
*Admitted Pro Hac Vice*
19 Treworthy Road
Gaithersburg, MD 20878
202-975-9105
Email: brentevannewton@gmail.com

**Counsel for Defendant**
**Marcus Spanevelo**

## CERTIFICATE OF SERVICE

On July 2, 2026, I filed this brief via this Court's CM/ECF system, which served all counsel of record.

/s/ Jeffrey Ertel
Jeffrey Ertel